[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
First it is found that all the allegations of the first count of Plaintiff's amended complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
The remainder of this court's task has been divided into the following categories and will be discussed in that order:
1. The establishment of values in order to determine the total amount of the marital estate.
2. The preparation of a list of the assets of each of the parties at the present time using the values determined in Paragraph 1 above.
3. The evaluation of the evidence in accordance with the provisions of Sec. 46b-81c and Sec. 46b-82 C.G.S.
4. The distribution of the marital estate to the parties in accordance with the findings in Paragraphs 1 and 3 above.
5. The decision concerning alimony.
6. Other orders.
I. Concerning the establishment of values
The following values are found by this court.
 a. 254 Crystal Lake Road, Ellington, CT On July 2, 1990, Plaintiff's appraiser, Peter Marsele, set a value of $325,000 on this property, which was the family home, while Richard H. Barry, who appraised the property for the defendant, felt it had a value of $230,000 as of August 1, 1990. On the evidence this court finds the present value of the property to be $275,000. The unpaid balance of the mortgage on the premises is $113,297. There is also a judgment lien on the property in favor of Society for Savings in the amount of $9,550. While the lien is against only the Plaintiff, this court finds on the evidence that the parties are equally responsible for this debt.
CT Page 2947
 Deducting the mortgage and the Judgment lien from the value of the property $275,000 Less Mortgage $ 113,297 Judgment Lien 9,550 _________ $ 122,847 — 122,847 ________ it is found that the total equity of the parties in the property is $152,153 and the value of each 1/2 interest is $ 76,076.50
 b. 252 Crystal Lake Road, Ellington, CT This is a vacant lot adjoining the family home. Mr. Marsele felt the property had a value of $75,000 at the time of trial while Mr. Barry appraised the lot at $55,000. This court finds the value of this lot to be $60,000. The unpaid principal balance of the mortgage on said lot is $45,990, leaving a net equity in the property of $14,010. The value of each one-half interest is $7,005.
 c. Concerning the equity of the parties in the home and lot, i.e., $166,163; Defendant contends that there are several unsecured debts directly attributable to either the purchase or improvement of their property incurred prior to the separation of the parties and either currently still unpaid or paid by him subsequent to the separation of the parties. He argues that the $59,000 listed as marital installment debt on his financial affidavit filed with the court shortly after the parties separated should be considered in its entirety as a deduction in determining the net equity of the parties, as it was unrefuted during the trial. His argument has some merit with regard to debts personally owned by him alone, but this court is not convinced that Plaintiff should be bound by statements of her financial obligations listed on his financial affidavit.
 After reviewing all of the evidence, it is found that the following unsecured debts are properly to be considered in determining the ultimate net equity of the parties in the property: Credit Card advance for purchase of lot $ 10,000 Payment of Judgment to Enfield Bank 15,000 Debts to vendors on house 5,800 CT Page 2948 ________ $ 30,800
 Defendant shall receive credit for any of said bills paid by him subsequent to the separation.
II. The values of the properties in dispute having been established, a list of the assets of each of the parties is set forth below to facilitate the final distribution by the Court.
MARITAL ASSETS OF PARTIES
Plaintiff (wife) Defendant (husband)
254 Crystal Lake Road, Ellington, CT 1/2 equity in 2 parcels $67,682 Collectibles 1,500 Value $275,000 Bank accounts 83 1st mtg. $ 113,297 Stocks Bonds (1/2) 182 J/Lien 9,550 I.R.A. etc. 3,014 ________ — 122,847 _______ ________ $72,471 Total Equity 157,153 1/2 interest of Total Marital Estate $ 178,484 plaintiff 76,077
252 Crystal Lake Road, Ellington, CT
Value 60,000 1st mtg. — 45,900 _______ *Defendant to receive credit Total equity 14,000 for any of said bills listed 1/2 interest of in Ic supra paid by him plaintiff 7,005 subsequent to separation.
Total equity of plaintiff in all real estate $83,082
-1/2 total unsecured debt of $130,800* — 15,400 ________ Net to plaintiff $67,682 $ 67,682
Jewelry 21,225 Bank Accounts 76 Stocks Bonds (1/2) 182 State Teachers Retirement Fund 16,848 _______ $106,013
III. The evaluation of the evidence in accordance with the CT Page 2949 provisions of Sec. 46b-81c and 46b-82 C.G.S.
Each of the parties is 34 years of age. They were married on August 6, 1983 and separated on July 15, 1988, having lived together for about five years. Each of the parties is in reasonably and apparently good health, and they enjoy a similar station in their community.
Addressing the causes for the dissolution, Plaintiff testified that marital problems were minimal until the autumn of 1987 when Defendant's personality started to change as he became erratic and short-tempered. She said he became progressively worse during the early months of 1988 when she observed more than a professional relationship between him and his secretary. Defendant began to come home from work late and was away during weekends. Plaintiff's desire to raise a family was not shared by Defendant. Their sex life withered. Defendant elected to sleep "downstairs", and he began to receive unexplained phone calls in the evening. The husband of Defendant's secretary testified that he returned home unexpectedly from a fishing trip on Memorial Day weekend, 1988 at about 11 P.M. to find his wife and Defendant in bed, and unclothed. He later described the Defendant as "taking his time leaving — driving away slowly". Plaintiff began to lose weight and suffered from insomnia. In June, Defendant asked Plaintiff to retain an attorney, and in July, mentioned divorce. Finally, on July 15th, 1988, Plaintiff returned home unexpectedly from a summer class to find Defendant's secretary with him as he attempted to replace the lock on the front door. Plaintiff described him as saying to her "make an appointment if you want to get in". Plaintiff left shortly thereafter and has never returned to the family home.
For his part, Defendant testified that he had told Plaintiff on numerous occasions both before and after their wedding that he did not want children, and that this resulted in numerous arguments between them. He stated that in March, 1988, Plaintiff told him her biological clock was running and that she wanted a child; he replied "kids are not in my future." On this subject, he added that "our sexual relationship ended at that point". Defendant denied that the Memorial Day weekend episode with his secretary ever occurred and produced as a witness, a business associate who indicated he was elsewhere at the time.
This court finds the testimony of Plaintiff and her witness to be completely credible and that responsibility or fault for the breakdown of the marriage lies with Defendant.
Concerning the occupation, amount sources of income, and education, skills and employability of the parties, the following is noted: Plaintiff graduated from Eastern Connecticut CT Page 2950 State College in 1978 with a B.S. degree in elementary education and in 1985, received her M.A. degree from Central Connecticut State University. She has continued taking various courses and, in 1986, also received her real estate agent's license. Both before and subsequent to her marriage, she has been employed as a teacher in the Windsor Locks school system. At the time the parties separated, she was earning a net salary of $408 per week. At the start of this trial, about two years later, her net weekly pay had increased to $485 per week. At that time, she also reported net weekly earnings of $75 from real estate commissions for a total net weekly income of $560.
Defendant graduated from the University of Connecticut in 1978 with a degree in accounting, was employed in that capacity at Railroad Salvage at the time of his marriage and subsequent thereto entered into an accounting practice with James Lagana in East Windsor where he presently maintains his practice. Contrary to plaintiff's success in her work, defendant's financial affidavits indicate that while he had a net weekly income of $1,000 from his practice at about the time of the separation, it was reduced to $385 per week at the start of this trial. He reported an additional $175 per week rental income from his secretary who now, with her two small children, resides with him in the family homestead. Defendant has attributed his diminished income to the loss by death of his principal client in 1988. His financial affidavit submitted at the commencement of trial, and upon which this court has relied, reflects a net weekly income of $560, the same as that reported by Plaintiff.
In addition, since the marriage, the Defendant has been involved in various business enterprises, the success or failure of which this court has found it difficult to ascertain.
The Defendant in his words formed Roberge Leasing "as a leasing mechanism for computers and cars. The advantages were that the sales tax would be spread out, and the assets could be depreciated." Originally the parties in this action were equal partners, but in 1986, because, according to Defendant "Plaintiff was concerned about my health", he transferred to her all but a 10% interest in this entity.
Defendant has also been involved with two attorneys in the purchase and sale of real estate, particularly condominiums in the South Windsor area and to this end, Horizon Associates and Bell Properties were established by them. Defendant's financial affidavit also shows one-half interest in the Realty Network, Inc. and a one-fourth interest in Connecticut Homebuyers Network, Inc., both described as dormant corporations. In his financial affidavit Defendant has described all of these instrumentalities as having a negative net worth. CT Page 2951
This court has found it arduous and perplexing, even bewildering at times, to follow the financial road taken by the Defendant in his various enterprises and even more mind-boggling to confirm his present income from all sources. Its plight was not helped by the fact that Defendant has failed to file his personal income tax returns for both 1988 and 1989 because, as he stated, "I owe a lot on these and didn't have the money". Further, no Horizon Associates tax returns have been filed for the years 1988 and 1989.
While the financial affidavits of the parties reflect equal weekly net income, this court concludes on the evidence that the earning capacity or prospective earnings of the Defendant are considerably greater than that of the Plaintiff.
The assets and liabilities of the parties have been previously noted; their needs will be expressed in the final orders of the court.
Concerning the contributions of each of the parties in the acquisition, preservation, or appreciation in value of their respective estates, the evidence is as follows: Plaintiff stated that she entered the marriage with no material assets but with the hope and expectation that, with hard work, as a team and with continued good health, she and her husband would enjoy a happy life together. Defendant testified that at the time of the marriage, August 6, 1983, when he was less than 27 years of age and five years out of college, he had amassed a personal equity of $469,190.62. He explained his good fortune as follows, "I took advantage of the real estate and financial markets. I took a lot of chances and it paid off. I bought stock on margin — I made many of these risky investments — I stopped doing this in late 1982 or early 1983. My thinking had changed — I was contemplating marriage and didn't want the risk." While Defendant was unable to produce his income tax returns for the years 1977 through 1982, to confirm his remarkable success, Plaintiff did state that he owned a condominium and had almost completely constructed and furnished their home when they married. While Defendant had the skill to acquire a substantial pre-marital estate, he has been unable, since the marriage, and particularly since the separation, to preserve this estate or to enjoy its appreciation in value. This has been the case in spite of his stated conservative approach to business and finance following his marriage. His financial affidavit, submitted at the onset of trial, lists assets of — $29,934 and liabilities of $104,972. Plaintiff, lacking the financial background of Defendant, has somehow managed to remain solvent and appears on the evidence at the very least to be equally responsible for the preservation of whatever assets the parties now have. CT Page 2952
After weighing carefully all of the factors recited in these statutes, and giving particular attention to what it considers to be the predominating factors, i.e., the causes for the dissolution, the occupation and sources of income of the parties, and their contribution to the acquisition, preservation or appreciation in value of their marital estate, this court finds on all the evidence that Plaintiff is entitled to 60% of the total marital estate as determined by the court and Defendant to 40% thereof.
IV. a. The distribution of the personal property to the parties in accordance with the findings in Paragraphs I II.
Plaintiff (wife) 60% Defendant (husband) 40%
 Jewelry $21,225 Collectibles $ 1,500 Bank accounts 76 Bank accounts 83 Stocks Bonds 364 Stocks Bonds —
 Teachers retirement I.R.A.'s, etc. 3,014 fund 16,848 _______ ________ $ 4,597 $38,513
b. Real Estate
In making its orders concerning the real estate of the parties, the court notes the following: In her proposed orders submitted to this court, the Plaintiff has expressed no desire to retain the property. The Defendant has failed through lack of funds to pay his federal income tax for the past two years and has declared in his most recent financial affidavit, that he is insolvent. With this as a background, this court orders that the two parcels of real estate be immediately listed on the market for sale with a real estate agent and at a price either mutually agreed upon between the parties or at the value herein determined by the court. After deducting from the proceeds of the sale the amount of all incumbrances of record, the real estate commission, attorney's fees and the customary and usual other closing costs and adjustments, and after also paying or giving proper credit for the previous payment of the three bills listed in Paragraph Ic supra, the net proceeds of the sale will be added to the total value of the personal property previously assigned to each of the parties in Paragraph IVa above. The sum of these three items will constitute the total marital estate available for distribution. By applying to this figure the percentage awarded to each party and after deducting from the result the value of the personal property awarded to each party, the amount of the net proceeds from the sale of the real estate to be received by each party CT Page 2953 will thus be established.
Until such time as the real estate has been sold, the Defendant, who currently occupies the premises, shall be solely responsible for the payment of the mortgage, taxes, insurance and all other costs and expenses incurred while residing on the property. In the event Defendant vacates the premises prior to the date of transfer, the parties shall thereafter and until the date of closing share all said costs and expenses equally.
V. Alimony
Here, as previously noted, this court has considered all the provisions of Sec. 46b-82 C.G.S. The similar age and education of the parties, their good health, their equal net weekly income declared on their financial affidavits, and the relatively short duration of the marriage all dictate against a substantial or lengthy award, if any. This court is reluctant to follow this path because of its findings that Defendant was at fault for the breakdown of the marriage and that his earning capacity is greater than that of the Plaintiff. Its reluctance has been increased by Defendant's failure to file his federal income tax returns for both 1988 and 1989, which information would have been most helpful to the court in resolving this problem.
On all the evidence, this court orders that defendant pay plaintiff the sum of $1.00 per year as alimony for a period of three years. This order is non-modifiable as to term. The Defendant shall provided Plaintiff with copies of both his 1988 and 1989 federal income tax returns when they are filed and the parties shall exchange copies of said returns annually commencing in April, 1991, during such time as Defendant's obligation to pay alimony shall exist. This order shall sooner terminate upon the remarriage of the Plaintiff or the death of either party.
VI. Other Orders
 a. Plaintiff's maiden name of Eileen B. Bateson is ordered restored to her.
b. No order is made by this court to either party concerning life or health insurance or counsel fees. This court notes, however, the feeling that there should be some reasonable relationship between counsel fees and the amount of the marital estate. This does not appear to be the case in this matter.
c. With the exception of those debts listed in Paragraphs I a, b, c supra, each party shall be solely responsible for all debts listed on his or her financial affidavit and shall hold the other party harmless in that regard. CT Page 2954
JOHN D. BRENNAN, STATE TRIAL REFEREE